When it comes right down to it, your honors, we believe that this case is actually relatively simple, and which is, you know, what exactly, in terms of the detail of a remedy, do plaintiffs have to plead in order to get a remedy? In this particular instance, it appears that the court found that not only do we have to plead that a remedy exists, but we have to specify the exact nature of the remedy, and if you believe defendants, not only do we have to specify the exact nature of the remedy, but we have to identify by the make and model number and approval a specific device that would provide a remedy. What are you talking about, the common law claims? Essentially, the court found under the UCL claims, the common law claims, that there is no possible remedy here because the case falls within what the court made a logical leap, which is you have one hose, one nozzle, no draining, therefore it is impossible under the court's view for there to be a pump design that would resolve the issue. That really goes to the amendment that would say that there are other designs that could be done. But, you see, the common law claims, the one ground is the fairty to give advance notice. So your argument doesn't deal with that. Your honor, we If that's correct, it takes care of your common law claims. We do, we actually do have, we believe that the notice that we gave was reasonable under the circumstances. Your notice came with the complaint? The notice didn't come with the complaint. The notice was a separate letter that was sent to the defendants. It was sent at the same time that the complaint was on file, but it wasn't just the complaint being delivered to defendants. Okay, but Cardinal Heldt says the notice must be given before the suit is filed. Your honor, we disagree that Cardinal Heldt actually says that. Okay, well then we ought to talk about that. Cardinal Heldt is a completely different situation. In Cardinal Heldt, there was no notice given at all. Cardinal Heldt says that, but you're saying that this is distinguishable from these facts, because it does say that. You're right, your honor, I apologize. Cardinal Heldt does say that, but we believe that the facts under Cardinal Heldt present a very, very different situation. At most, when Cardinal Heldt says that, that's simply dicta, because it wasn't necessary to reach the conclusion in Cardinal Heldt. But why not? Because why wasn't it necessary to reach the conclusion that notice must be given before the filing of the suit? Because in Cardinal Heldt, the plaintiff waited two years after it discovered the situation. So in deciding that, they had to say, well, you waited two years, so therefore you lose. But that leaves open the question of if you waited one year, they had to give the narrowest possible factual holding? They didn't have to give the narrowest factual, but the UCC specifically says reasonable notice. It doesn't say pre-lawsuit notice. So in interpreting the statute, the court said reasonable notice is notice before the filing of the suit. We believe that, again, it didn't need to go there in that case. It wasn't necessary. If it were two years, you wouldn't need to go to one year. But you can give a general principle. And the principle the California court gave is that it's reasonable notice means advance notice. Now, maybe they didn't have to decide on that ground, but it's certainly a legitimate ground on which to decide. It may be a legitimate ground on which to decide. I don't believe that the court really paid a whole lot of attention to that issue. Well, that's another question. Unfortunately, when we apply precedent, we don't examine how much time or effort or how bright the judges were. You know, they may even have been wrong, and we follow precedent. Your Honor, there's also Ninth Circuit precedents, however. From 1960. It is from 1961. What we're applying is California law. So since our precedent, California law has developed. And our 1960 view of what California law was is not very relevant after California law has rejected our view. Your Honor, we would respectfully say that Cardinal Health is the only case that anyone can cite to under California law that holds this. It was obviously dicta in the case because it wasn't necessary for the holding. And we don't believe that Cardinal Health represents such strong precedent that this court has to follow. Is there a contrary view of Cardinal Health in California? There are no views of Cardinal Health in California as far as we know. I would call over to see if Cardinal Health had been amended or slightly revised or a little bit different. Didn't find any. I found Cardinal Health dead on point and didn't know how to get around it. Your Honor, all we can say is that we don't believe that. That's dicta. Yeah. That's a good way. That's a good way. We don't have another argument, Your Honor. We believe that Cardinal Health, if it did decide that, was decided wrongly because it expressly goes against the statutory language of the UCC. All right. And as I understand it, really looking very hard at your brief, you didn't even put anything in your opening brief about the breach of duty of good faith and fair dealing. It falls or rises with the breach of contract claim. So to the extent that the breach of contract claim. Well, I appreciate that it might rise or fall. My worry is that it wasn't even discussed. It was briefly discussed. We basically said it rose and fell with the breach of contract claim. And to the extent that the breach of contract claim either survives or doesn't survive, the duty of good faith and fair dealing goes with that. Let's get to issue two then, which is the unfair competition claim. Why isn't that disposed of by the safe harbor provision in state law if the design is approved by the state agency? Your Honor, the state. And it's authorized by the legislature. You have an approved device. You have a safe harbor. Your Honor, the case law doesn't say that if you have an approved device, you have a safe harbor. The case law says that if the conduct which we're complaining about is either required or affirmatively permitted, the conduct that we're complaining about is that defendants pumps. But it's affirmatively permitted. There's nothing that says in anything that defendants cite to that it is permitted for these pumps to pump out .3 of a gallon of gas, which is not of the grade that the consumer purchased. It's required. Under the regulations, they can't drain it. They cannot drain between pumps. But they can certainly, there's several different things that they can do. One is they can design a pump such as the request for judicial notice that we provided, which doesn't require draining of the hose but still provides a full 100%. Right. But if the law allows the pump to be used the way it is, how can there be liability for using it that way? That's what I don't understand. How you can say there's liability for using a pump that's mandated by the regulations. The design of the pump isn't mandated by the regulation. There's nothing in the regulations that says you are required to provide .3 of a gallon of the previous gas. There's nothing in the regulations that says you can provide .3 of a gallon of the previous gas. The only thing the regulation says is that it needs to be a single nozzle, a single hose, and a non-draining device. But there's evidence in the record that the NIST was aware of this residual effect and nevertheless sanctioned or approved this design. It was aware, there was a 1989 report from the NIST. The report basically dealt with how do you test these pumps for octane ratings? And it said how much of the gas do you need to siphon off before you do the test for octane rating? They did a test and they said about .3 of a gallon. That's the extent of that report. It doesn't say that the people who have these pumps and are getting that .3 of a gallon don't have a right to complain about it. Well, but the design was approved despite the knowledge of the experts, the people that regulate this, and calibrated that this was going to be the effect of having this design. The NIST handbook doesn't say that the design has to do this though. And where there is the possibility of not doing it. It doesn't say you may do this. It doesn't say you have to do it. But does it say you may use this kind of pump? It doesn't. It says the only things the NIST guidelines say is that it has to be a single nozzle, that it has to be a single hose, and it needs to be non-draining. But recognizing that this would be the effect of using this and nevertheless, the California Standards Board implemented the design with everyone aware that this would be a consequence of using this design and nevertheless certified these pumps for use. We don't believe they actually did that. They looked at it and said this is what we're going to adopt. There was no discussion at the time that California adopted the NIST guidelines of whether or not there were other pump designs available that would eliminate the .3 gallon. Don't we have to presume that the regulators read the NIST report and studies before promulgating the regulations? There's nothing in the record to support that. Well, there's nothing in the record to support when any legislation or regulation is implemented or adopted that studies have been done. But that's the presumption that's done because that's how legislation is done. That's how regulations are promulgated. But Your Honor, the issue is whether or not the standard to get under the safe harbor is strict. It's not just can you possibly allow this to occur. Well, to get under the safe harbor, as I understand it, that the courts cannot get their own notions in if the legislator permitted certain conduct or considered a situation and concluded that no action should lie. In this particular matter, that's why I don't know why you're so big on safe harbor, the legislature, through its adoption of Handbook 44, indirectly, through certification of the pumps at issue, which they knew left this discharge residual fuel, affirmatively permitted the unfair conduct. We're done. Your Honor, we would respectfully disagree that they affirmatively permitted the conduct. Well, they didn't do anything about it. They knew it was happening. They adopted Handbook 44. It allows for this. They certified it. What more do they need to do, go out and say I brand it? I think they would have to have found explicitly that providing 0.3 of a gallon was permitted conduct. Nowhere in the NISD Handbook or in the report does it say that that is permitted conduct. It simply says these are the standards for a pump. Why would they certify it for use if it weren't permitted? There's lots of things that can be certified for use that are still under a civil remedy somebody can get a claim for. For example, a roof that collapses, which was certified for use in California. Does that mean that that certification prevents somebody from suing because the roof collapsed on them? Well, if the roof was certified as meeting the standards for the state, it would be difficult to file a suit if something's already been certified by the body that regulates. And I'm not sure there's a body that regulates roofs and how safe they need to be. But in this particular case, there was specific regulation. And I'm not sure that that analogy covers this situation. I would respectfully disagree that it doesn't. I think the fact that a certification of something is being permitted as a device to put into the stream of commerce exists doesn't mean that the regulation that a consumer may find untowards or unfair is also permitted. A certification, for example, of a car as meeting certain NHTSA standards doesn't mean that if a bumper fails in an accident that that certification is sufficient to ---- This is a specific, you're suing on the specific standard that was in the regulation. That's different than saying a car is certified. It would be like saying the bumper is certified. Here you have a specific item that you're challenging having been certified for use with specific acknowledgement that this residual is going to be part of the measurement. Your term is up. You've got one issue if you want one minute on it. The third issue is the unfair advertising. You want disclosure, I guess, wherever on the signs in the gas station that you're going to get this wonderful present of this extra gas. You want a minute on that? I would be happy if you would give me a minute, please. We do believe that the PMPA posting rule doesn't preempt notice of this issue. There are basically two reasons for it. The first is that we're not asking them to do anything with the little yellow label that PMPA provides, which is what the octane rating of the specific gas that's being pumped out is. What we're saying is that they need to disclose as to the particular pump device, that that particular pump device is incapable of providing the .3 of a gallon or one-third of a gallon that the consumer is getting of the grade of gas that they're getting. And the distinction here is that it's not the octane necessarily that's the issue. For example, defendants advertise all sorts of things associated with their different grades of gas, such as it contains nitrogen, it's a cleaning agent, it has this, our V-Power gas is superior to all of our regular gasolines because it has all these extra additives and things in it. The preemption in the PMPA is very broad in terms of what other information can be provided. But it's broad in the sense of what other information can be required. It's narrow in the sense that it only talks about the octane rating of the gasoline. If the information that you're asking to be provided is not what the octane rating of the gasoline is, but rather has to do with something else, then PMPA preemption does not apply. And in this particular instance, we believe that PMPA preemption does not apply because what we're asking for is that the consumer is not a disclosure as to octane, but as to the ability of the pump to provide a particular grade or type or brand name of gasoline. Thank you, Your Honor, for your extra time. We'll give you two minutes to rebuttal. Thank you, Your Honor. Good morning. May it please the Court. Darius Oglosa on behalf of Chevron USA. And I'll be arguing for all of the appellees in this matter. As the district court recognized in its opinion, the principal defect in the plaintiff's second amended complaint is that it completely disregards the regulatory scheme governing gasoline sales in the United States. Really, of all the businesses, I'd have to say that we're probably among the most highly regulated. The dispensers that we use have to receive government certification. There are very specific guidelines set forth in Handbook 44, which has been incorporated into California law, which allows us to do certain things and doesn't allow us to do other things. Viewed in this regulatory contest, it is plain that the business practice that's complained of here, using a single hose dispenser to dispense multi-grade gasoline products, is not only authorized by California law, but it's also mandated. We can't drain the pump. Once we start the meter, we can't change the price. We have to use that single hose. And those regulatory judgments, and probably the real fallacy in Plaintiff's argument, is that those regulatory judgments somehow are rubber stamps. That we could just go to an agency tomorrow with some kind of new design and say, will you approve that? The most we could do is speculate what the regulators will do if they are confronted with a new design. They're also going to have to possibly rewrite the rules that govern the usage. Let's say there's a new kind of draining mechanism that doesn't pose a problem, that's designed. Well, they're going to have to go back and revise those regulations in Handbook 44 to change that. We can only speculate what they will do. We also can only speculate what other folks in this arena will do as well. There's the dispenser manufacturers. Are they going to want to manufacture this stuff? Better than 90% of this market is governed by small franchisees. Are they going to be wanting to change out their install base? If there's a determination that what is being done is unlawful, they wouldn't have a choice but to change the design. That's absolutely correct, Your Honor. But to this point that somehow we have some technology somewhere hidden on a shelf and that there's some rubber stamp between us and implementing it, it's ridiculous. I just wanted to make sure that the Court was aware of that. Be sure to take some time for the preemption argument because we only have about a half minute from the other side. Certainly, Your Honor. The PMPA's express preemption provision... No, I didn't mean you had to go to it immediately. Be sure to take some time for it. In fact, I'm happy just to go there, Your Honor, at this point. The PMPA preemption provision is very broad. It basically says no additional terms, no supplemental terms. We're going to let the FTC regulate this. What's your response to opposing counsel's observation that that applies only to the fuel ratings and not to the ability of the pump to dispense all of the gas that the customer has purchased? What's your response to that? Well, Judge Rawlinson, my response would be that that's a distinction without a difference. There's no permutation of plaintiff's argument that doesn't either question the adequacy of those stickers or desire to add more language to those stickers. It doesn't have to be on the sticker. It can be any place on the pump. It can be in that little screen where the advertising is. So his argument is he's not asking for you to change the label, which deals solely with the fuel ratings. He wants a disclaimer, a disclosure. You may not be getting all of the gas grade that you've paid for. Understood, Your Honor, understood. The preemption provision in the PMPA isn't limited to just what's on the yellow sticker. What it says is we don't want any additional or supplemental terms or anything that challenges the adequacy of what that says. If we put a little sign on the dispenser that says, when you buy 91 octane, you may not be getting all 91 octane, depending on certain factors, that undermines the adequacy of that designation of the 91. Of the fuel rating. You may be getting 9.7 gallons of 91, but you're getting .3 gallons of 89 or something. Exactly, Your Honor. So what it's doing is it's challenging the adequacy of that disclosure. So when the FTC says, run this test at the refinery, put that sticker on it, and that's conclusively presumed to be accurate, that's what the preemption provision is really protecting. It's sort of that regulatory region, as it were, for the FTC. And that's what's being done there. With respect to the contractual notice... Go ahead. This is really your area. Go ahead. I'll come on. I deny that. Are you talking about Section 2824 of the U.S. Code 15? No, this is with respect to the PMPA provision. Yes, I believe that that's the provision. That to the extent that any provision of this subject applies to any act of omission, no state or political subdivision may adopt or continue in effect. Is that the one? That's the one. That's correct, Your Honor. And is your argument that if no state action is taken other than a court determination, that that's covered by that? So even if there's no state regulation on this, if a court were to say, yes, you may put this notice somewhere in the gas station, that would be preempted? We would respectfully submit that that would fall within the ambit of that statute. Especially when you look at the posting rule that's been promulgated to implement the statute. Exactly, Judge Rawlinson. As I understand it then, your argument is, and I had the same statute in mind, that we're really talking about not only how you rate, but how the rating is posted and what information should be on the posting, and that this is in fact a preemption of any outside interference in that particular situation. That's the way you read that language? That's correct, Your Honor. And as I understand it, the regulation also suggests there's no penalty for failing to disclose any residual fuels effect on the rating. That's absolutely correct. And that's right in the regulation? That's correct. I think it's a clear inference. So your argument is regardless of whether or not the additional information is on the yellow label itself or someplace else in the vicinity of it. Exactly. Anywhere on the pump, inside the pump. There's nothing in that PMPA preemption provision that limits itself to being necessarily on that, which as I'm sure the Court has observed, is a very small statute. It really is going towards a larger issue there with respect to leaving this regulatory. Nothing would prohibit a gas station from advertising on the pump or the gas station with the big sign they hang up that you're not going to get your full quantity of the gas you order. We respectfully submit that it would, that that preemption provision is sufficiently broad that it tells people that if you, because that would challenge the adequacy of the octane rating that's actually disclosed. Well, this only applies to preemption provision to what a state or political subdivision can do. How does it prohibit a gas station voluntarily from doing it? That's a very good point, Your Honor, and I missed the vector of that question. More importantly, I think that that service station owner might run into big trouble with the FTC because that's the body that regulates. And they have a clear rule that says this is how you do this process. As the case that's relied on by the plaintiffs, that VP Racing case shows, there's a lot of skullduggery and nonsense in some of this stuff where people will try to sell you 100 octane fuel and it turns out to be 97. The FTC really is intent on sort of carving out and making sure that there is a process that's followed that the entire industry can trust. Gas prices are very important to consumers. Oh, absolutely. Undoubtedly. Undoubtedly. All right. Thank you. Just one additional, couple additional points. Mr. Parekh represented that Cardinal Health was the only decision on the pre-lawsuit notice. There's one other that we're aware of that we wanted to make the court aware of. It's the Arata decision, A-R-A-T-A. And I have, unfortunately, a partial cite. Well, after your argument, give a copy to the clerk. And have you told your opponent about that? It was in the district court decision. I was going to say that's in the district court. Yeah, I just wanted to make sure that that was clear. I have four minutes, but unless the court has any questions. Thank you. Just two points, Your Honor. The Arata decision is from 1957, so it predates the Ninth Circuit decision that we cite. But not Cardinal Health. Sorry? But not Cardinal Health. Correct, Your Honor. As to the PMPA issue, there's under Section 2822G, it explicitly states under Section 1 that the foregoing provisions of this section, which restrict what can be posted, shall not apply to any representation by display at the point of sale or by other means of any characteristics of any automotive fuel other than its automotive fuel rating. So 2822 explicitly narrows and very explicitly narrows its disclosure and preemption to simply the automotive fuel rating, whether it's 91 octane or not. As we discussed below and in the briefs, that's not the only issue here. The issue here is, are you getting the grade of gasoline that you're paying for? And defendants on all of their pumps name their gasolines. They say, here's our super duper clean, extra clean, nitrogen enriched, and this gasoline will help rev your car and clean your engine and smoke your turkeys and whatever else you want it to do. And they advertise those not just on whether or not they're 91 octane rating, but they advertise those on characteristics other than the octane rating. So a consumer is entitled to know that they're not getting 100% of this particular named gasoline that the defendants say that they're going to get. But that's a chicken and an egg theory. And the actual, the honest import of what you're really arguing is, we're not getting all the octane we truly want in the first little bit. And you can state it any way you want, but the bottom line is, what you're really telling me is that my car, who will only take premium gas because it's old and that's what my dad told me to buy, is not really getting that premium gas and I want that octane in order to get that. I don't know how to get around that, because the bottom line of your argument is, you're getting not the octane you really wanted. It's not even clear that you're not getting the octane that you really wanted. The issue is you're paying for... You're paying to not get the octane you really wanted. Well, you're paying for a grade of gas. You're paying for something. I mean, defendants go out of their way to advertise their gasoline by differentiating it on things other than price. The fact is you may or may not be getting. Right. You don't know. You don't know. You may be getting a boost. You may be getting higher octane gas than you paid for lower octane gas. Right. So it's a crapshoot. And the only way you can tell is by looking at the pump before you reset it to see what the person before you bought. Why shouldn't the consumer get to know that information? So that they can intelligently, if they want, for their 1967 Chevy Camaro, be able to go to a pump and look and say, Hey, you know what? The guy before me, he bought regular gas. I'm going to move my car up to the next pump where somebody bought. And hope they got. The power gas. You could spend an hour chasing the octane you want. You certainly could. Or a 310. But it is certainly something. If I had an uncle who went all over town looking for the best price, it took him three hours to do it. That's all, Your Honor. Thank you. Thank you very much. Thank you all for an interesting argument. The court will stand in recess for the day. Thank you. I know you're going to bring me Jeff Rollins, but I thought maybe I ought to help Judge Reinhardt. He doesn't have a lot of work here. Oh, really? Can we take a break? We can do it. No, no. Don't worry about it, Your Honor. I got it. Okay. I got it. Thank you. Thank you. Yep. Thank you. Can I help you with anything? I think we're set. Oh, it's good. You did more than a hand. We got boxes, so we're good. Yeah, we're bringing them to the fourth floor anyway. Thank you, darling. Thank you very much. You, too. I'm just putting them in order so I remember. Is it all going to fit in there? Not too bad. Yep. Yeah. Before we have those submitted. Perfect. Then I will just leave this back there. Should I take this? No. No, you can leave that there.  She's already taken notes. Did she? I don't know. I'm just going to leave this back there. Let me take that one. You can take this one. That's okay. Thanks. I think it's easier to go this way. What? It might be easier to go this way. I'm not ready here. Okay.
judges: Reinhardt, Rawlinson, Smith N. R.